## Case No. 12,093.

### ROWE et al. v. The BRIG.

[1 Mason, 372.] [1]

Circuit Court, D. Massachusetts. May Term, 1818.

SALVAGE—DERELICT—AMOUNT OF COMPENSATION.

Of salvage in cases of derelict. In general a moiety is the rule of salvage in cases of derelict; but it is a flexible rule, yielding to circumstances.

[Cited in The Waterloo, Case No. 17,257; The Emulous, Id. 4,480; The Boston, Id. 1,673; The Henry Ewbank, Id. 6,376; The Rising Sun, Id. 11,858; The Elizabeth and Jane, Id. 4,356; Peabody v. Proceeds of Twenty-Eight Bags of Cotton, Id. 10,869; Bean v. The Grace Brown, Id. 1,171; Sprague v. One Hundred and Forty Barrels of Flour, Id. 13,253; The John Gilpin, Id. 7,345; The Adolph, Id. 86; Montgomery v. The T. P. Leathers, Id. 9,736; Spencer v. The Charles Avery, Id. 13,232; The Georgiana, Id. 5,355; The Charles Henry, Id. 2,617; West Transp. Co. v. The Great Western, Id. 17,443; The Hyderabad, 11 Fed. 754; The Fairfield, 30 Fed. 701, 702; The Bay of Naples, 1 C. C. A. 81, 48 Fed. 738, 739 ]

[See note to The Adventure, Case No. 93.]

[Cited in Eads v. Brazelton, 22 Ark. 499; Baker v. Hoag, 7 N. Y. (3 Seld.) 561.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel for salvage. The material facts were as follows: On the 28th day of October, 1817, the schooner Hope, owned by the libellants [Isaac F. Rowe and others], sailed from Boston on a fishing voyage, with a crew of four men, commanded by Henry Geyer. After being out a couple of days, and during a heavy squall, they discovered a vessel at about four miles' distance from them, apparently in distress. On running down to her they found her to be a brig without any person on board, and in a very shattered condition. They at first attempted to take out her lading, and put it on board their schooner; but the weather being so tempestuous as to render this impracticable, it was determined to bring her if possible into Boston. For this purpose the

1 [Reported by William P. Mason, Esq.]

captain and two of the crew went on board of her, and the schooner was ordered to keep close company. After three days of great exertion and imminent danger, during all of which time they were exposed to a very severe storm and heavy gales of wind, and in consequence thereof separated from their schooner, they succeeded in bringing the brig into Boston harbour, and running her on shore at Thompson's Island, from whence they afterwards got her off, brought her up to Boston, and there libelled her for salvage. A claim was interposed by the Spanish consul for the property, as belonging to certain Spanish subjects unknown. The brig and cargo were appraised at the gross value of 26,201 dollars, and at the net value of 20,951 dollars; and upon the hearing, the district court decreed as salvage to the libellants the sum of 3,000 dollars. From this decree the libellants appealed to the circuit court.

Mr. Prescott and William Sullivan, for appellants.

G. Blake, for appellee.

The argument principally turned on the proper amount to be decreed as salvage. And to this point the following cases were cited by the counsel for the appellants and appellee:

For the appellants: The Amelia, 4 Dall. [4 U. S.] 34; Hindry v. The Priscilla [Case No. 6,515]; Wilkie v. Two Hundred and Five Boxes of Sugar [Id. 17,662]; British Consul v. Twenty-Two Pipes and Ten Hogsheads of Wine [Id. 1,900]; The Mary Ford, 3 Dall. [3 U. S.] 188; The Adventure, 8 Cranch [12 U. S.] 226; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Favorite, 4 Cranch [8 U. S.] 346; 1 Beaw. Lex Merc. 158, 162; The Aquila, 1 C. Rob. Adm. 37; The Jonge Bastiaan, 5 C. Rob. Adm. 323; The Lord Nelson, Edw. Adm. 79; L'Esperance, 1 Dod. 49; The Blenden-Hall, Id. 421; Tyson v. Prior [Case No. 14,319]; Warder v. The Belle Creole [Id. 17,165]; Taylor v. The Cato [Id. 13,-786]; Bell v. The Ann [Id. 1,245]; Bond v. The Cora [Id. 1,620]; Flinn v. The Leander [Id. 4,870]; The Jefferson, 1 C. Rob. Adm. 325.

For the appellee: The Favourite, 4 Cranch [8 U. S.] 347; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Mary Ford, 3 Dall. [3 U. S.] 188, 19 Vin. Abr. "Salvage," A, 3; Moll. de J. Mar. bk. 2, c. 5, § 7.

STORY, Circuit Justice. There is no dispute in respect to the facts of this case; and upon these facts it is clearly a case of derelict in the sense of the maritime law. For to constitute a derelict in that law, it is sufficient, that the thing is found deserted or abandoned upon the seas, whether it arose from accident or necessity, or voluntary dereliction. Sir William Scott has declared, that a legal derelict is properly, where there has been an abandonment at sea by the master and crew without hope of recovery. The

Aquila, 1 C. Rob. Adm. 37. With the view, for which the words "without hope of recovery" are introduced, viz. to distinguish a temporary absence from a permanent abandonment, it might perhaps have been more accurate to have said, an abandonment without an intention of return; since the spes recuperandi might exist even though the abandonment were without such intention. In another case (The Jonge Johannes, 4 C. Rob. Adm. 266) the same learned judge seems to have entertained an opinion; that if a vessel be captured and afterwards abandoned by the enemy, it is not properly a case of derelict; because neither the owner, nor those who were in possession, as his agents, have committed any act of dereliction. So that, in this view, to constitute a derelict, there must be a voluntary abandonment by the master and crew. But this opinion, as I gather from later cases (The Lord Nelson, Edw. Adm. 79; The Blenden-Hall, 1 Dod. 414), has been silently retracted; and certainly it is not recognised as the doctrine of this country. Sir Leoline Jenkins (1 Sir Leo. Jenk. Works, 89) has given a true definition in its most broad and accurate sense, when he says derelicts are "boats or other vessels forsaken, or found on the seas without any person in them." It is true, that the civil law attached a very different sense to the term; for a thing was not a derelict in that law, unless the owner voluntarily abandoned it without any further claim of property in it. "Pro derelicto autem habetur quod dominus eâ mente abjecerit, ut id in numero rerum suarum esse nolit" (Inst. lib. 2, tit. 1, § 46); and therefore a thing cast overboard in a storm to lighten a vessel was not esteemed a derelict.[2]

The only question for the consideration of the court is, what amount of salvage ought, under the circumstances of this case, to be allowed to the salvors. This is said, and properly said, to rest in the discretion of the court; a discretion, however, which is not to be exercised at the mere arbitrary will of the judge, but as far as possible to be governed by principles of law and sound reason. I confess that I never feel more distressed, than when called upon to exercise a general and unlimited discretion. In cases of this sort, it can hardly be presumed, that different judges, even when possessing equally enlightened and sound judgments, would form precisely the same estimate. And yet it is very desirable to discourage appeals upon slight grounds, or with a view to take the chances of a different opinion. In deciding, therefore, upon the decrees of the district court in cases of salvage, my inquiry never has been so much, whether the allowance was the same, as I should originally have made, as

[2] "Quod ex naufragio expulsum est usucapi non potest, quoniam non est in derelicto sed in deperdito." 3 Poth. Pand. lib. 41, tit. 7 (8) p. 155, § 2; Id. lib. 41, tit. 1, p. 119. See, also, Locc. de Jur. Mar. lib. 1, c. 7, § 6; 1 Emerig. c. 12, p. 611, § 40.

whether, under all the circumstances of the case, justice and sound policy clearly indicated a different measure. And, distrusting my own judgment, I have on all occasions sought to apply the spirit of those decisions, which a higher tribunal has recognised and enforced, and to follow in the path of authority, rather than venture upon new and untried courses of my own.

In cases of salvage, the measure of reward has never been adjusted by a mere estimate of the labor and services performed by the salvors. These, to be sure, are very important ingredients; and are greatly enhanced in value, when they have been accompanied by personal peril and gallantry, by prompt and hardy enterprise, and by severe and long-continued exposure to the inclemencies of the winds and waves. But an enlarged policy, looking to the safety and interest of the commercial world, decrees a liberal recompense, with a view to stimulate ambition, by holding out what may be deemed an honorable reward. Nor should it be forgotten, that the same policy has a strong tendency to discourage petty plunderage and concealment of the property saved; and to induce salvors to bring it in good faith before judicial tribunals, and rely upon their justice for ample remuneration. In most cases of salvage, it is extremely difficult to lay down a satisfactory rule to guide the judgment. But where a particular proportion has been frequently applied in a class of cases, I do not think, that slight, or even considerable distinctions in the circumstances ought to induce a court of law to depart from that proportion. It is better to adhere to a rule, which may operate somewhat unequally, than to leave every thing afloat in mere undirected discretion.

In cases of derelict, it was the ancient rule of the admiralty to give the salvors a moiety of the property saved. This is very distinctly articulated in the Black Book of the Admiralty, as a known and settled rule of division. The Aquila, 1 C. Rob. Adm. 37; Roughton, arts. 6, 47. And it continued in practice, at least to the close of the reign of Charles the 2d; for there is an express decree, in 1683, recognising its existence. The Aquila, 1 C. Rob. Adm. 37. I incline to believe that it was originally borrowed from the civil law, by analogy to the case of treasure found in some public place, in which case, by a decree of the Emperor Adrian, one moiety was given to the finder and one moiety to the public (Inst. lib. 2, tit. 1, § 69; 3 Poth. Pandects, lib. 41, tit. 1, p. 101); which was precisely the mode of distribution in the admiralty, where no owner appeared; for then one moiety was under the grant of the crown considered a droit of the admiralty. Be this as it may, Sir William Scott considers, that the rule is become obsolete, and that de jure salvors are not now entitled to claim a moiety. The Aquila, 1 C. Rob. Adm. 37. Yet it is very apparent, that his judgment is now in no small degree influenced by the rule in all cases, to which it was originally applicable. In The Fortuna, 4 C. Rob. Adm. 192, which was the case of a vessel found derelict on the British coast, and, in many respects, resembled the case now in judgment, he allowed a salvage of two fifths, and added, "If there had been any considerable danger attending the act of salvage, I should have given, what the court is in the habit of giving in cases of derelict, an entire moiety." In a still more recent case he observed, that "in cases of derelict the court not unfrequently gives one half of the property saved; and this, perhaps, was done in all cases of the same kind, according to the old law." The Blenden-Hall, 1 Dod. 414. In that case however (which was a derelict) the property being of the value of £72,000, he gave the salvage of one-tenth only, a sum which, under the circumstances, with some difficulty approves itself to my judgment. In all other cases of derelict, which have come before him (and there have been several) he has allowed either a moiety, or two-fifths of the property. The Aquila, 1 C. Rob. Adm. 37. The Jonge Bastiaan, 5 C. Rob. Adm. 322; The Lord Nelson, Edw. Adm. 79; The Maria, Id. 175; L'Esperance, 1 Dod. 49. And in similar cases before the supreme court, proportions as favorable to the salvors have been uniformly adopted. The Mary Ford, 3 Dall. [3 U. S.] 188; Mason v. The Blaireau, 2 Cranch [6 U. S.] 240; The Adventure, 8 Cranch [12 U. S.] 226. The ordinance of France gives, in all cases, one third of the gross value [3] of derelicts; and the same rule (as Loccenius informs us) is generally adopted by Sweden and the other northern states. 2 Val. Comm. 635; Locc. de Jure Mar. lib. 1, c. 7, § 10. Nor have I met with a single instance, in which a lower rate of salvage has been established by the municipal law of any modern maritime nation. And from this it may, perhaps, be gathered, as the general sense of the maritime world, that the rate of salvage on derelicts should not in ordinary cases range below a third, nor above a moiety, of the value of the property.

At the argument I intimated an opinion, that in cases of derelict the old rule ought still to be considered as a subsisting, but flexible rule; and that primâ facie the salvors were entitled to a moiety; and that it was incumbent upon the claimant to establish, that under the special circumstances of the case a different measure ought to be applied. And this opinion was given with reference to the fact, that a moiety still continues the favorite proportion of judicial tribunals, if we can trust to the accuracy of reports. Upon subsequent reflection, I feel not the slightest inclination to change that opinion; and as a limit upon judicial discretion in ordinary cases, I think it a safe and salutary rule. When I say, however, that the rule is flexible, I do not mean, that it bends to every

---

[3] This is probably, in most cases, about two fifths of the net value.

slight change of circumstances. But cases may occur of such extraordinary peril and difficulty, of such exalted virtue and enterprise, that a moiety, even of a very valuable property, might be too small a proportion. And on the other hand there may be cases, where the service is attended with so little difficulty and peril, that it would entitle the parties to little more than a quantum meruit for work and labor. These are exceptions (and others might be stated) to the operation of the rule which may perfectly consist with its general obligatory force. It is not necessary, however, to proceed in the present case upon this ground, reasonable as it seems to me, because the facts establish a most meritorious claim, and a most perilous adventure on the part of the salvors. It seems almost certain, that, but for them, the brig and cargo would, in the intervening storm, have been wholly lost; and if the evidence is believed, they were actually saved at the most imminent personal peril. Under such circumstances, I cannot but entertain the opinion, that the salvors are entitled to a very liberal recompense. I cannot sit here for the purpose of weighing in minute scales the exact quantity of labor and toil, and of anxiety and peril, and thus break the case into fragments, to compare it with the fragments of other cases. Looking to all the circumstances, it seems a case of real merit; and if so, it is the duty of courts of justice to deal out a liberal allowance.

I do not find, that in the district court a different view was entertained of the evidence. Indeed it is so uniform in its tenor, that no room seemed left for judicial doubts. But the learned judge thought himself bound to discourage a practice, which seems of late unfortunately to have crept in, for persons pretending to make, or actually making, captures under the flag of the South American patriots (as they are usually termed) to endeavour to procure an admission of their prizes into our ports; and for this purpose to hover on our coasts, and make use of fraudulent pretences and disguises, by which the revenue laws are sometimes violated, and the public peace endangered. The learned judge, therefore, thought it his duty to diminish the inducements of our citizens to join in these illegal enterprises, by awarding a less sum for salvage of such prizes, than the circumstances of the case might otherwise justify. I have great deference for the opinion here expressed, and feel a solicitude equal to that, which has always so laudably distinguished my brother, to prevent the judicial tribunals of the United States from becoming auxiliaries in these illicit purposes. In a proper case I would go a great way to enforce the due observance of our neutral rights and du-

ties; and where they were clearly violated, I should deem it no strain of the law to declare the right to salvage forfeited. But my difficulty lies in applying the doctrine to the present case. There is not a shadow of evidence, that this vessel and cargo were brought into port under any collusive agreement with the supposed captors, or that her distress and abandonment was merely colorable. Nor is there any allegation to this effect set up in the claim of the Spanish consul. There is a considerable probability, that the vessel and cargo are Spanish; and that they were captured by persons acting under the patriot flag; and that they were deserted by the captors on our coast. But even these facts are not established; for no papers or persons were found on board, so that there is a total absence of the usual proofs. And admitting, that these facts were ever so well established, still if the salvors have conducted themselves with good faith, and have not been parties or privies with the captors in any fraudulent or collusive purpose, it is not easy to perceive, why they should be visited with what is in effect the punishment of guilt. The law gives them the full benefit of their title to salvage, unless they have forfeited it by their own misconduct. No such misconduct is shown here; and indeed it is expressly negatived on oath by every person claiming to be a salvor. It seems to me, therefore, that the court is bound to deal with the case, as with every other of derelict; and that if public policy requires a different rule of salvage for Spanish vessels from that, which now governs us, it ought to be furnished by the legislature. Nor can it be considered as a hardship upon the Spanish owner, that he receives his property again, loaded with the expense of salvage, when it would have otherwise been a total loss to him; and when he receives it upon as favorable terms as could be claimed by our own citizens. In a case of collusion, established by direct proof or strong presumption, I should have little difficulty in applying the penalty of forfeiture against the claim of asserted salvors.

With whatever reluctance, I feel myself constrained to reverse the decree of the district court; and shall decree to the libellants a moiety of the net value of the brig and cargo, after deducting all duties, charges, and expenses, including therein the costs of court, and the legal expenses of both parties. I shall farther order the cargo to be sold at public auction, and the proceeds brought into court for distribution. The vessel is to be taken, in estimating the salvage, at her appraised value, unless the claimant shall elect to have her sold, in which case she is to be sold in the same manner as the cargo. Decree reversed.